IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHRISTINE VAN DE YACHT,

                Plaintiff,                    OPINION AND ORDER

     v.                                   08-cv-604-bbc

THE CITY OF WAUSAU and JAMES
TIPPLE, WILLIAM NAGLE, MICHAEL
MORRISSEY and ANN WERTH, in their
individual capacities,

                Defendants.

---

      In early 2006, plaintiff Christine Van De Yacht, then a member of the Wausau

Common Council, was investigated by the city's ethics board at the request of the council

after she purchased property that had been awarded money from a blight elimination fund

on which plaintiff had voted as an alderperson.  After a public hearing, the ethics board

found that plaintiff's conduct had violated the code of ethics and recommended that she be

censured.  Less than two weeks later, plaintiff's term on the council ended without any

action being taken by the council on the ethics board's recommendation.

      In this civil rights action brought pursuant to § 1983, plaintiff contends that the

ethics board's finding was the climax of an orchestrated, deceitful plot to silence her in

retaliation for her outspoken criticism of the city's development department.  Plaintiff has

sued the city officials who she contends were the plot's masterminds, alleging that their

actions violated her rights to free speech and equal protection, damaged her reputation and

caused her monetary damages.   (Although plaintiff also asserted state law claims of defamation, she has conceded that those claims are barred by the statute of limitations.   In addition, plaintiff concedes that she is not alleging any wrongdoing on the part of the City of Wausau, but has named it as a defendant only as an indemnitor of the individual defendants if liability is found.)

Defendants have moved for summary judgment, contending that plaintiff cannot prevail on the merits of her First Amendment retaliation or equal protection claims because it is undisputed that she continued to speak and advocate for her constituents during the pendency of the ethics proceedings and because no reasonable finder of fact could conclude that the city's decision to launch an ethics investigation was motivated by plaintiff's protected expression.   Further, defendants contend, even if plaintiff could prove that her claims had merit, defendants are shielded from liability by the doctrine of qualified immunity.   Because I agree that the scope of First Amendment protection for elected policymaking officials like plaintiff was not clearly established at the time of the alleged retaliation in this case, defendants' motion will be granted on the ground of qualified immunity.

One preliminary matter deserves mention.   Plaintiff has asked this court to disregard a number of arguments raised by defendants on the ground that they raised them for the first time in their reply brief.   Ordinarily, I would agree.   In this case, however, in the course of asking the court to disregard defendants' new arguments, plaintiff has addressed the cases cited by defendants in their reply brief, made arguments why they do not apply and cited

additional cases supporting her position.  Overall, plaintiff has had sufficient opportunity to address the qualified immunity defense.  It is not unfair to grant summary judgment to defendants on that ground.

From the parties' proposed findings, I find the following facts to be material for the purpose of deciding the summary judgment motion.


UNDISPUTED FACTS

Plaintiff Christine Van De Yacht is a resident of the state of Wisconsin.  She served as an elected member of the Wausau City Council from April 1998 to April 2006.  The events at issue in this lawsuit occurred during the time period from 2004 to 2006.  During this period, the individual named defendants held various posts for the City of Wausau. Defendant James Tipple was mayor; defendant William Nagle was city attorney; defendant Michael Morrissey was the director of the Community Development Department; and defendant Ann Werth was employed as a manager in the Community Development Department.

At all times material to this action, the City of Wausau received federal funding from the United States Department of Housing and Urban Development (HUD) in the form of Community Development Block Grants (CDBG).  The city's Community Development Department, headed by Morrissey, was charged with the responsibility of determining which projects to fund using the block grant funding.

Morrissey and plaintiff had an acrimonious relationship during her tenure on the city council.  Morrissey had heard rumors that plaintiff and another council member, Deb Hadley, had a "hit list" of city staff whom they wanted fired, and that his name was on the list.  Morrissey shared his concerns with his friend, Nagle, who was also rumored to be on the list.  Morrissey periodically spoke of plaintiff in angry terms after board meetings at which he and plaintiff were present.

On June 11, 2003, a local developer named Skip Ellenbecker purchased property and two buildings located at 117 and 121 South Second Avenue, known as the "Golden Guernsey property," in Wausau.  During a chance encounter in early 2004, Ellenbecker and plaintiff discussed the Golden Guernsey property.  Plaintiff told Ellenbecker that she and her husband, Dennis Van De Yacht, owned and operated a marketing firm and were interested in the buildings as a new location for their business.

On February 26, 2004, Ellenbecker met with Werth and Morrissey to ask about possible help from the city for improvements on the Golden Guernsey property.  During the meeting, Ellenbecker told Werth and Morrissey that he wanted to raze some of the brick buildings on the property and gut the rest, and then sell them to a commercial developer.  Morrissey indicated that the city might be able to offer Ellenbecker an unsecured, interest-free loan of $25,000 from community development block grant blight elimination funds, with Ellenbecker to pay back the loan upon the sale of the property.  Ellenbecker said that although he had no agreements in place with anyone, plaintiff was one of the investors in a group that was interested in purchasing the property.  Morrissey and Werth told

4

Ellenbecker that an ethics problem might exist if plaintiff purchased the property and that they would consult with the city attorney.

After the meeting, Morrissey emailed Nagle, expressing his concerns about plaintiff's potential involvement in the Golden Guernsey deal.  According to Morrissey, Ellenbecker had said during the meeting that plaintiff was one of the investors in the company that was interested in buying the property after it had been gutted and that plaintiff had asked him not to mention her interest to anyone in the Community Development Department. Morrissey wrote:  "[T]he most obvious question is whether council member Vande Yacht [sic] voted on the CDBG program, knew about it, and then indicated to [Ellenbecker] that he should call us (not telling us that she was invovled [sic] in the deal) so that the deal could benefit from this CDBG fund."

In a second email to Nagle the same day, Morrissey noted that the previous month, plaintiff had asked Werth to drive by a property immediately to the south of plaintiff's advertising business to judge whether the property might be considered blighted and available for demolition funding from the city.  Morrissey also mentioned that at a meeting of the Economic Development Committee the previous week, plaintiff had raised questions about how the Community Development Department advertised its commercial rehabilitation program.  According to Morrissey, plaintiff was concerned that the program was not advertised widely and stated that she would like it advertised in the city's newsletter.

5

Whether and how Nagle responded to Morrissey's emails about plaintiff's potential conflict of interest is unclear from the record.  (According to Morrissey, Nagle advised him after these emails that plaintiff had not committed an ethical violation unless she had entered into a contract with Ellenbecker.  Nagle does not recall having provided this advice.)  In any case, it is undisputed that after the initial meeting with Ellenbecker, none of the defendants told plaintiff or Ellenbecker that a conflict of interest would arise if plaintiff was to purchase Ellenbecker's property after it had been the recipient of city blight funds.

At a May 13, 2004 meeting of the Finance Committee, Morrissey informed the committee that the city had made a commitment to Ellenbecker to lend him $25,000 toward the development of the Golden Guernsey property.   Plaintiff was not present at this meeting.  On May 14, 2004, the Community Development Department used block grant funding to extend a $25,000 interest-free loan to Ellenbecker to be used for "blight elimination" at the Golden Guernsey property.  Unlike other similar loans, the loan to Ellenbecker was not presented for discussion and review to the Economic Development Committee, on which plaintiff sat.  At the time the loan was extended to Ellenbecker, plaintiff had not yet purchased the property and had not entered into any contracts with Ellenbecker with respect to any future plans to purchase the property.

On February 23, 2005, Morrissey wrote a letter to Tipple, complaining that at a meeting the night before, plaintiff had accused Morrissey of having a conflict of interest with respect to a proposed purchase of property using city grant money.  In Morrissey's view, plaintiff's comments bordered on the slanderous and were "inexcusable."  Morrissey asked

Tipple to "correct this matter immediately with any and  every resource available to the City."  Morrissey reminded Tipple that approximately six months earlier, Morrissey had informed Tipple about the "hit list" rumors and had asked him to put an end to what he saw as constant, unmerited criticism by plaintiff and Hadley.  Morrissey wrote:  "Here we are six months later and the abuse and harassment continues."

On April 29, 2005, Zuivelfabriek, LLC, a limited liability co-owned by plaintiff and her ex-husband, bought the Golden Guernsey property from Ellenbecker.  Before doing so, plaintiff had not been advised by defendants or any other city employees that she might have a conflict of interest if she purchased the property.

On June 28, 2005, the city council met in a closed session after its regular council meeting to discuss a possible land acquisition by the city.  During the meeting, Nagle became angry with plaintiff when she made a comment suggesting that unnamed city staff had failed to disclose certain information relevant to the acquisition, at one point telling plaintiff that she should "throw down . . . we're going right now."  Plaintiff thought Nagle was challenging her to a physical confrontation and walked out of the meeting.  Later, in plaintiff's absence, Nagle told Tipple and the other council members that he felt that by failing to disclose the source of her information, plaintiff was intentionally seeking to injure him or Morrissey.  Although Morrissey was not present at the meeting, he later heard about Nagle's confrontation with plaintiff.

On July 7, 2005, plaintiff wrote to Tipple and the City of Wausau Ethics Board, complaining about Nagle's conduct at the June 28 meeting and requesting an ethics hearing.

7

In a letter dated July 26, 2005, the board chairman, Harvey Scholfield, responded that although Nagle's conduct might have been rude and unprofessional, it did not involve the jurisdiction of the Ethics Board.

On August 10, 2005, Morrissey met with Bob Berlan, Patrick Fjerstad and Jeremy Beitz, officials from HUD, to report alleged misconduct by plaintiff in connection with her purchase of the Golden Guernsey property.   (Although plaintiff has alleged, without objections from defendants, that Werth also attended this meeting, the record does not support this allegation.)  Before this meeting, none of the defendants told plaintiff that her purchase of the property was under scrutiny or asked her any questions about the matter. On October 27, 2005, Morrissey exchanged email correspondence with Fjerstad about the matter.  Morrissey wrote that he expected that as a result of HUD's investigation, plaintiff would be disqualified from voting on the community block grant development program. Morrissey indicated that he was concerned about the timing of any HUD-issued sanction, noting that the common council was to vote on the block grant program in December. Morrissey wrote:  "If the HUD letter comes after that council meeting, then there really are no consequences for the conflict violation because the voting will already have occurred."

On November 17, 2005, Morrissey emailed Fjerstad to say that he was anxious to receive a contemplated letter from HUD.  Later that day, Beitz emailed Berlan, stating that on the basis of the information that Morrisey had provided on August 10, Beitz had concluded that there was sufficient evidence of a conflict of interest and benefit from a

CDBG-assisted activity on the part of plaintiff. Beitz attached a draft of a proposed letter to Berlan for his review and signature. A copy of this letter was forwarded to Morrissey.

In an email to Berlan on November 21, 2005, Morrissey wrote that he took plaintiff's violation very seriously because it appeared to have been pre-conceived and that plaintiff had benefited personally by saving approximately $2,000 in interest fees as a result of the interest-free CDBG loan made by the Community Development Department to Ellenbecker. When Morrissey wrote this, he did not know what the terms of the sale had been between Ellenbecker and plaintiff. Morrissey again expressed his desire that plaintiff be barred from having input or voting on CDBG-related programs.

On November 21, 2005, HUD issued its determination. In a letter to Morrissey, Berlan wrote that on the basis of information that Morrissey had provided, HUD had reason to believe that plaintiff's purchase of the Golden Guernsey property had been undertaken while she had a conflict of interest, and that her actions had allowed her to obtain a financial benefit from block grant-assisted activity, in violation of HUD regulations. As a result, the CDBG loan for the Golden Guernsey property was an ineligible use of HUD funds and the city would have to repay the funds unless it requested HUD to consider the loan to be an eligible activity. Morrissey forwarded a copy of this letter to Tipple.

HUD never contacted plaintiff before it issued this letter. Plaintiff first became aware that her activities with respect to the Golden Guernsey property were under scrutiny on November 22, 2005, when she received a letter from Tipple. In the letter, which included a copy of the November 21, 2005 correspondence from HUD, Tipple stated that he had

9

scheduled a meeting on November 29, 2005 to discuss the issue with plaintiff. Tipple wrote that plaintiff's input was "important relative to how the City of Wausau proceeds in taking a further course of action."

Plaintiff retained John Runde to represent her in the matter. Runde contacted David Eckert, the lawyer representing the city on the matter, to ask that the meeting be rescheduled because he had a previously scheduled medical appointment on that day. However, Eckert never responded to Runde's call, and the meeting never took place. Thereafter, Tipple scheduled the matter for a closed session review before the common council, but Runde again asked that the session be adjourned for scheduling reasons.

On November 30, 2005, plaintiff announced that she was not going to seek re-election to the city council because she was moving from the district.

On December 1, 2005, Ellenbecker provided Eckert an affidavit in which he described his discussions with plaintiff about the purchase of the Golden Guernsey property. According to Ellenbecker, plaintiff had advised him during negotiations regarding her purchase of the property that blight money was available from the city, and asked that he keep her interest in the property confidential. Ellenbecker indicated that at the time of the sale, plaintiff knew that the city had extended a block grant loan for the demolition of part of the property.

After receiving the affidavit from Ellenbecker, Tipple made two requests for plaintiff to resign. She did not do so. On December 13, 2005, the city council met in closed session after its regular council meeting to discuss the ethics allegations against plaintiff. Tipple

10

issued a memo to the council, alerting it to the allegations against plaintiff and his requests for her resignation. Tipple stated in the memo that plaintiff had declined his offer to discuss the matter informally. This was not true: plaintiff had not declined to discuss the matter, but had been unable to meet because her lawyer had scheduling conflicts no one from the city had sought to accommodate. The council voted to refer the allegations regarding plaintiff's purchase of the Golden Guernsey property to the Wausau Ethics Board. After the meeting, the mayor issued a press release that included the November 21, 2005 correspondence from HUD, the November 22, 2005 correspondence from Tipple to plaintiff and the December 13, 2005 memorandum from Tipple to the council. In a letter dated January 4, 2006, Tipple referred the matter to the ethics board.

On April 5, 2006, after providing notice to plaintiff, the Wausau Ethics Board convened a hearing to consider plaintiff's alleged violation of the ethics code. At plaintiff's request, the hearing was open to the public. After the hearing, the Ethics Board recommended that plaintiff be censured for her conduct as an alderperson, concluding that plaintiff's purchase of the property violated the ethics code. Plaintiff continued to serve on the city council until new members were sworn in on April 18, 2006. The city council never issued a formal censure against plaintiff.

DISPUTED FACTS

The parties disagree whether plaintiff told Ellenbecker that city funding might be available for the Golden Guernsey property before he talked to Morrissey and Werth and

11

whether she knew before purchasing the property from Ellenbecker that he had requested and been granted community block grant development funding for improvement of the property.  The parties also dispute whether plaintiff obtained a financial benefit from the CDBG loan that was extended to Ellenbecker.  These facts are immaterial to deciding the summary judgment motion.


OPINION

A.  Summary Judgment Standard

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions, and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'"  Sides v. City of Champaign, 496 F.3d 820, 826 (7th Cir. 2007) (quoting Brummett v. Sinclair Broadcast Group, Inc., 414 F.3d 686, 692 (7th Cir. 2005)).  In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party, in this case, the plaintiff.  Squibb v. Memorial Medical Center, 497 F.3d 775, 780 (7th Cir. 2007).  At the same time, the nonmoving party retains the obligation to "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

12

B.  First Amendment Retaliation

To prevail on her § 1983 retaliation claim, plaintiff needs to prove that 1) she was engaged in constitutionally protected speech; 2) public officials took adverse actions against her; and 3) the adverse actions were motivated at least in part as a response to plaintiff's protected speech.  Mosely v. Board of Education of Chicago, 434 F.3d 527, 533 (7th Cir. 2006).  Although plaintiff has left it unclear what specific statements provoked the alleged retaliation, defendants concede that, as a general matter, plaintiff's political speech on behalf of her constituents was constitutionally protected.  Presumably, both sides are referring to plaintiff's questioning Morrissey closely about the community block grant program. Defendants contend that they are entitled to summary judgment because 1) plaintiff did not suffer an adverse action; 2) the city council's decision to investigate the alleged ethics violation against plaintiff was not motivated by plaintiff's protected expression; or 3) they are protected by the doctrine of qualified immunity.

Qualified immunity shields public officials from liability when they act in a manner that they reasonably believe to be lawful.  Anderson v. Creighton, 483 U.S. 635, 638-39 (1987).  The Supreme Court has identified two key inquiries for qualified immunity assertions:  (1) whether the facts, taken in the light most favorable to the plaintiffs, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation.  Pearson v. Callahan, --- U.S. ----, 129 S. Ct. 808, 815-16 (2009); Saucier v. Katz, 533 U.S. 194, 201(2001).  In Pearson, 129 S. Ct. at 818, the Court held that lower courts are free to decide the two questions

13

controlling a qualified immunity analysis in whatever order is best suited to the case at hand; a negative answer to either one is enough to establish the defense of qualified immunity. The Court noted that when the parties have not briefed the constitutional question adequately, the court may wish to proceed to the second inquiry in order to avoid reaching a poorly informed decision on the question whether there has been a constitutional violation at all. Id. at 820.

Such is the situation here. The defendants have not characterized the constitutional issues with precision. They suggest that the alleged retaliatory action in this lawsuit was the "enforcement of the Wausau Ethics Code" by the city of Wausau, and they articulate various reasons why that action was not motivated in any way by plaintiff's protected expression. However, plaintiff does not allege any impropriety on the part of the city council in referring the allegations against her to the ethics board or allege any impropriety or malfeasance in connection with the ethics board's investigation. She seeks recovery from the city solely in its role as an indemnitor for the individual defendants under Wis. Stat. § 895.46, which directs political subdivisions to pay judgments against public officers or employees for acts committed within the scope of their employment. Thus, although the city is a defendant, its actions with respect to the ethics allegations against plaintiff are not at issue. (Nothing in plaintiff's complaint or submissions suggests that she could prove liability on the part of the city under Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 404 (1997), which would require her to show that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." (Emphasis in original).)

14

What plaintiff complains of are the actions by the individual defendants *leading up* to the ethics investigation. Plaintiff's description of the acts of retaliation committed against her is as follows:

> Ms. Van De Yacht was allowed to purchase a property that had been improved by a loan of city funds to the previous owner, by city officials whose duty it was to warn her against doing this. A reasonable jury could infer that they allowed this situation to coalesce as it did precisely so they would be in a position to see to it that Ms. Van De Yacht was investigated and punished. Defendants Morrissey and Werth lodged allegations against her with the Department of Housing and Urban Development, including a false allegation that she had benefitted in the amount of $2,000 from the city loan, and a false allegation that she had been warned by Werth. Then, she was made the subject of public requests for her resignation by [Tipple], who lied about her refusal to meet with him, and formal ethics proceedings that created so much adverse publicity that her marketing business was destroyed.

Plt.'s Br. in Opp., dkt. #28, at 8.

Apart from observing that "there does not seem to be any viable allegations against Mayor Tipple or Ann Werth," Defs.' Reply Br., dkt. #34, at 3, and pointing out that neither Morrissey nor Nagle voted to refer plaintiff's alleged ethical violation to the ethics board, id. at 8, defendants do not offer any individualized response to these allegations, either in their initial brief or their reply. They fail to point out the myriad problems that plaintiff would face in proving a constitutional deprivation at trial, including the absence of any evidence that the individual defendants were acting in concert, that Werth or Tipple had any retaliatory animus towards plaintiff or that an unbroken chain of causation existed between defendants' actions and the subsequent inquiry by the ethics board. In spite of the fact that it might be appropriate to award summary judgment to defendants for one or more of these reasons, I think it is best not to make defendants' arguments for them. Sublett v. John

15

Wiley & Sons, Inc., 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving

party does not raise an issue in support of its motion for summary judgment, the nonmoving

party is not required to present evidence on that point, and the district court should not rely

on that ground in its decision."). By and large, plaintiff's allegation that the individual

defendants retaliated against her for her protected speech by "ginning up" ethics charges

stands unopposed.

Defendants contend that plaintiff has no actionable retaliation claim because her

speech was not actually chilled. As I have noted in the context of a retaliation claim brought

under the right of access to the courts:

> It should be obvious that the standard [for determining an injury under the
> First Amendment] does not bar relief to a plaintiff simply because he refused
> to be deterred. Otherwise, a claim involving retaliation for exercising the right
> of access to the courts would be impossible to win. A person who brought a
> lawsuit would by definition show that he could not prevail on his claim
> because the lawsuit itself would be conclusive evidence that he was not
> deterred. At the same time, however, a victim of retaliation who did not file
> a lawsuit would be without a legal remedy as well. Thus, the question is not
> whether the plaintiff was actually deterred, but whether "the harassment is so
> trivial that a *person of ordinary firmness* would not be deterred from" exercising
> his constitutional rights. Pieczynski v. Duffy, 875 F.2d 1331, 1333 (7th Cir.
> 1989) (emphasis added).

Hennings v. Ditter, No. 06-C-353-C, 2007 U.S. Dist. LEXIS 41746 (W.D. Wis. June 7,

2007). See also Gullick v. Ott, 517 F. Supp. 2d 1063, 1078 (W.D. Wis. 2007) (rejecting

argument that plaintiff's having complained to sheriff's office immediately after he was

stopped by deputy sheriff defeated plaintiff's First Amendment retaliation claim).

Defendants' "no actual chill" argument does not help their defense.

However, defendants have a solid qualified immunity defense.  Even if plaintiff has succeeded in defeating summary judgment on the question whether defendants retaliated against her for exercising her First Amendment rights, defendants are shielded from liability if "their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Akande v. Grounds, 555 F.3d 586, 589 (7th Cir. 2009).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.  Because "the purpose of qualified immunity is to protect public officials from guessing about constitutional developments at their peril, the plaintiffs have the burden of showing that the constitutional right was clearly established." Gonzalez v. City of Elgin, 578 F.3d 526, 540 (7th Cir. 2009) (citing Purtell v. Mason, 527 F.3d 615, 621 (7th Cir.2008)).  To meet her burden, plaintiff must come forward with "a clearly analogous case establishing a right to be free from the specific conduct at issue." Smith v. City of Chicago, 242 F.3d 737, 742 (7th Cir. 2001).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Anderson, 483 U.S. at 640).  In the absence of a case factually similar to the one at bar, defendants are entitled to qualified immunity unless the alleged misconduct constitutes an obvious violation of a constitutional right. Wernsing v. Thompson, 423 F.3d 732, 749 (7th Cir. 2005).

17

In the absence of any attempt by defendants to prove otherwise, I begin by assuming that what plaintiff says defendants did is true:  they failed to warn plaintiff that she was about to commit an ethical violation, and then, after she did so, reported it to a federal agency and the city council in a way so as to make the violation seem more egregious than it actually was, all in the hopes of stirring up an ethics investigation in order to deter plaintiff from meddling in certain city affairs.  (With respect to defendant Nagle, plaintiff also argues that he retaliated against her for her remarks at the June 28, 2005 meeting by becoming angry and physically threatening her.  Although Nagle's statements may have been rude or disorderly, the offensiveness of the comments does not give rise to a violation of plaintiff's First Amendment rights.  Allowing a city official to be sued under § 1983 for losing his temper at a meeting would either flood the federal courts with political squabbles or chill the freedom of debate among policymaking officials on matters of public concern, neither of which is a desirable or constitutionally permissive result.)  Defendants argue that even if their alleged conduct amounts to First Amendment retaliation, they are entitled to qualified immunity in light of plaintiff's status as an elected official.  According to defendants, the right of elected officials to be free from retaliation for political speech was not clearly established at the time of the alleged conduct.

I agree.  As proof that the actions by defendants in this case have previously been held unlawful, plaintiff points to Spiegla v. Hull, 371 F.3d 928, 933 (7th Cir. 2004), and Bart v. Telford, 677 F.2d 622, 624 (7th Cir. 1982), in which the court held that public employees have a right to be free from even minor harassment, such as making fun of an employee for

bringing a birthday cake to the office to celebrate another employee's birthday, provided the circumstances are such as to make such a refusal an effective deterrent to the exercise of First Amendment rights. Plaintiff argues that the "campaign of harassment" to which defendants subjected her in this case was at least as egregious as those involved in Bart and Spiegla. But in neither of those cases was the court confronted with the situation that exists here: a claim of retaliation by an elected official against other public officials (some elected, some not), none of whom had the power to discipline plaintiff or exercise any control over the conditions of her employment. In this case, it is plaintiff who held the position of power, with the ability to make decisions and set city policy that could affect city staff, including defendants. Because of her status, plaintiff stood in a position vis-à-vis defendants that is very different from that of the rank-and-file civil servants who prevailed in the cases cited by plaintiff. The government-as-employer, civil servant-as-employee cases are simply not analogous. See Fairley v. Andrews, 578 F.3d 518, 524 (7th Cir. 2009) (noting that it was "novel question" whether Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410 (2006), would apply to claim that it was co-worker and not employer who curtailed speech); Thaddeus-X v. Blatter, 175 F.3d 378, 399 (6th Cir. 1999) (en banc) ("Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse.").[1]

_____

[1] Although Garcetti v. Ceballos, 547 U.S. 410 (2006), was not decided at the time of the alleged violations in this case, it is worth noting that after Garcetti, district courts have found no First Amendment protection for a public official's speech made pursuant to his or her official responsibilities. See, e.g., Hartman v. Register, 2007 WL 915193, *6 (S.D. Ohio 2007) (finding "distinction between the public employee in Garcetti and an elected official" to be

Although I have not found a case from the Seventh Circuit considering the question, at least two circuit courts and one district court in this circuit have found that the First Amendment offers no protection for politicians subject to retaliation by their foes for their positions on matters of public concern.  In <u>Romero-Barcelo v. Hernandez-Agosto</u>, 75 F.3d 23, 34 (1st Cir. 1996), the former governor of Puerto Rico brought a § 1983 suit against elected members of the Puerto Rico Senate from the opposing party, alleging that they had slanted and manipulated testimony at legislative hearings to make it look as if he was involved in illegal activity and that they had publicly defamed him in order to harm his reputation and his chances for re-election.  The court of appeals upheld the district court's finding that the plaintiff had no viable claim under the First Amendment, agreeing that the Amendment does not protect "a politician whose rights to freedom of speech, freedom of association, and freedom 'to disassociate [oneself] from unpopular views' have been injured by other politicians seeking to undermine his credibility within his own party and with the electorate."  <u>Id.</u> (quoting <u>Barcelo v. Agosto</u>, 876 F. Supp. 1332, 1348 (D. P. R. 1995)).

In <u>Camacho v. Brandon</u>, 317 F.3d 153 (2d Cir. 2003), the Second Circuit held that the termination of a city council staffer because of the exercise of First Amendment rights of the opposition member with whom the staffer had a close professional and personal

_____

"inconsequential" and finding that member of township's board of trustees was acting pursuant to official duties in opposing minutes of board meetings); <u>Rangra v. Brown</u>, 2006 WL 3327634, at *5 (W.D. Tex. Nov. 7, 2006)("For purposes of determining what constitutes protected speech under the First Amendment, there is no meaningful distinction among public employees, appointed public officials, and elected public officials"); <u>Hogan v. Township of Haddon</u>, 2006 WL 3490353, at *7 (D.N.J. Dec. 1, 2006)(applying <u>Garcetti</u> to elected township commissioner).

relationship was not actionable under § 1983 as a retaliatory discharge.  Although the court found that the staffer had standing to assert the First Amendment rights of the council member who was allegedly retaliated against, it rejected the plaintiff's claim that such retaliation was actionable.  The court reasoned that the policy rationales articulated by the Supreme Court in Elrod v. Burns, 427 U.S. 347 (1976), and Branti v. Finkel, 445 U.S. 507 (1980), in which the Court held that a government employer did not violate the First Amendment by punishing an unelected "policymaking" employee on the basis of the employee's political affiliations, had equal if not stronger force "where an individual or entity exercising governmental powers seeks to retaliate against a publicly elected official based on the latter's votes and political affiliations."  Camacho, 317 F.3d at 161.  To hold otherwise, said the court, "would subject to litigation all manners and degrees of politically motivated, retaliatory conduct directed at public officials."  Id. at 162.

Judge Griesbach reached the same conclusion in Footit v. Van De Hey, 2005 WL 1563334 (E.D. Wis. June 29, 2005).  In that case, a member of the Winnebago County Board of Supervisors sued the county executive and a member of the board, alleging that they had retaliated against him for opposing county funding for a wetland preserve by asking the  Winnebago County District Attorney to investigate a possible charge against him for misconduct in office.  In response to defendants' request, the district attorney initiated John Doe proceedings, which ultimately resulted in a finding of insufficient evidence to prove Footit had violated the law.  Noting that "neither the First Amendment, nor § 1983, was intended to shield politicians from the political process itself," id. at *4 (citing Elrod, 427

21

U.S. at 373), Judge Griesbach found that although Footit was entitled to sue defendants in state court for libel or slander if they intentionally or recklessly defamed him, he had no claim for First Amendment retaliation under § 1983 even if defendants had accused him of a crime purely because of his positions on issues of public concern.  Reasoning that "[a]ttacks on the character of those holding public office are as old as the country itself," id. at *4, and that the accusations leveled by Footit's opponents were themselves entitled to First Amendment protection, id., Judge Griesbach went on to find that Footit was "not entitled to sue his political opponents just because he thinks their motivation for accusing him of misconduct was not pure."  Id. at *5.

Other courts have not gone so far as to declare that an elected public official may never bring a First Amendment retaliation claim, but they have come close to that conclusion in cases involving facts more egregious than this one.  In Colson v. Grohman, 174 F.3d 498 (5th Cir. 1999), a former city council member sued the municipal police chief and other city officials under § 1983, contending that they retaliated against her for opposing the police chief's staffing proposal for his department by knowingly making false accusations against her in public, attempting to pressure the County Attorney to issue formal charges and then, after the County Attorney found no basis to issue charges, instituting a recall action against the plaintiff that contained false allegations.  Although the recall effort failed, the plaintiff lost her bid for re-election.  Relying on Fifth Circuit precedent, the court of appeals found that the plaintiff's First Amendment retaliation claim failed because the most she had alleged was that the defendants had made false allegations against her, which under Fifth Circuit law

22

was actionable only if the false accusations led to a tangible adverse action.  Id. at 512.  The court also rejected plaintiff's contention that, taken together, the various false accusations made by defendants amounted to an actionable "campaign" of retaliatory harassment.  After noting that the "campaign of harassment" cases arose typically in the employment context, id. at 514, the court found that the actions taken by defendants did not rise to an actionable level:  "[T]he defendants' allegedly retaliatory crusade amounted to no more than the sort of steady stream of false accusations and vehement criticism that any politician must expect to endure."  Id.

In Mattox v. City of Forest Park, 183 F.3d 515, 522 (6th Cir. 1999), a former city council member brought suit under § 1983 against the city's police chief, city manager and one of its police officers, alleging that they had retaliated against her for her actions in investigating the police department by publishing a report and video that contained many unfavorable references to her and her role in the investigation.  The thrust of her complaint was that the adverse publicity from the video and report caused her to lose her bid for re-election.  Concluding that the plaintiff had not pleaded a sufficient injury to make out a claim for First Amendment retaliation, the court reasoned:

> As an elected public official, Mattox voluntarily placed herself open to criticism of her actions and views on political matters.  A deliberate attempt to discredit Mattox, especially if initiated in retaliation for her actions in investigating the fire department, is perhaps an inappropriate and unfortunate occurrence, but on the facts of this case, it is not the type of "adverse action" against which the First Amendment protects.  It is not equivalent to being fired by a government employer for expressing protected views.  We do not think it would deter a public official of ordinary firmness from exercising his or her right to speak under the First Amendment.  Public officials may need

23

to have thicker skin than the ordinary citizen when it comes to attacks on
their views.

Id. at 522.

Finally, in McWaters v. Cosby, 54 Fed. Appx. 379 (4th Cir. Dec. 27, 2002)
(unpublished opinion), a member of a county board of supervisors brought a § 1983 action
against various county officials, alleging that they had retaliated against her for her criticism
of the county school board by instituting an investigation into her travel expenditures and
then refusing to reimburse her for legal fees that she incurred while defending herself during
the investigation.  The district court found that the plaintiff had successfully pleaded a
violation of her right to be free from retaliatory government action and that that right was
clearly established at the time of the alleged violation.  McWaters v. Rick, 195 F. Supp. 2d
781, 794-805 (E.D. Va. 2002).  Although the appellate court did not disturb the first of
these findings, it disagreed with the district court's conclusion that the right asserted by
McWaters was clearly established:

> McWaters points to no cases which are factually analogous.  Her case is
> atypical, in part, because she is an elected public official, rather than a rank-
> and-file public employee.  As an elected public official, the First Amendment
> interests implicated are different from those of  an ordinary civil servant and
> local officials are not required to perfectly predict what a court will later
> determine those interests to entail.

McWaters, 54 Fed. Appx. at 384.

From these cases, it is plain that if plaintiff has alleged any First Amendment violation
at all, she cannot show that a reasonable official in the defendants' positions would have
known that he or she was violating the law when engaging in the various acts of retaliation

24

alleged in this case.  Accordingly, defendants are entitled to qualified immunity on plaintiff's First Amendment retaliation claim.

### C.  Equal Protection

Defendants are also entitled to summary judgment on plaintiff's equal protection claim.  Plaintiff's equal protection claim rests on the theory that defendants treated her differently from other similarly situated individuals because of her protected expression.  Framed in this way, plaintiff's equal protection claim fails with her First Amendment claim.  As the court explained in Vukadinovich v. Bartels, 853 F.2d 1387, 1391-1392 (7th Cir. 1988):

> Normally, we think of the Equal Protection Clause as forbidding the making of invidious classifications---classifications on the basis of such characteristics as race, religion, or gender.  Here, plaintiff is not claiming that he was classified on the basis of some forbidden characteristic, only that he was treated differently  because he exercised his right to free speech.  We believe this is best characterized as a mere rewording of plaintiff's First Amendment-retaliation claim, which was properly disposed of.

Grossbaum v. Indianapolis-Marion County Building Authority, 100 F.3d 1287, 1296 n.8 (7th Cir. 1996) (equal protection clause "does not establish a general right to be free from retaliation"); Watkins v. Bowden, 105 F.3d 1344, 1354 (11th Cir. 1997) (" To the extent Watkins contends that she was dismissed because of her expressive activity, that claim arises under the First Amendment"); Thompson v. City of Starkville, 901 F.2d 456, 468 (5th Cir. 1990) (dismissing plaintiff's equal protection claim in retaliation case because it "amounts

25

to no more than a restatement of his first amendment claim").  Plaintiff's equal protection claim must be dismissed.


ORDER

IT IS ORDERED that the motion of defendants City of Wausau, James Tipple, William Nagle, Michael Morrissey and Ann Werth for summary judgment is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 13th day of October, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge

26